| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| ***v.*** | ) | ***No. 2:11-cr-127-DBH*** |
| | ) | |
| **ANTHONY E. ALMEIDA, III, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

## RECOMMENDED DECISION ON MOTIONS TO SUPPRESS

Anthony E. Almeida, III, and John Martin, each charged with one count of possession of counterfeit obligations of the United States in violation of 18 U.S.C. § 472, *see* Indictment (Docket No. 33), seek to suppress evidence seized from a pickup truck in which they had been traveling following a roadside stop in Turner, Maine, on July 5, 2011, and during a subsequent "inventory search." *See* Motion To Suppress ("Almeida Motion") (Docket No. 48) at 3; Motion To Suppress Evidence ("Martin Motion") (Docket No. 55) at 7-10.[1] Almeida additionally seeks to suppress evidence found inside a wallet seized from his person during the traffic stop, *see* Almeida Motion at 4-5, and Martin additionally seeks to suppress statements that he made to law enforcement officers at the Androscoggin County Sheriff's Office ("ACSO") in the wake of his arrest at the site of the traffic stop, *see* Martin Motion at 9-11.[2]

---

[1] Although Almeida did not raise the issue of the inventory search in his motion, *see generally* Almeida Motion, his counsel joined in Martin's motion with respect to that point during his opening statement at a hearing held before me on December 8, 2011.

[2] Martin also sought to suppress post-arrest statements made without benefit of warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), to Detective Maurice Drouin at the site of the traffic stop. *See* Martin Motion at 10-11. The government has conceded that those statements were elicited in violation of *Miranda* and has pledged not to use them in its case in chief at trial. *See* Government's Objection to Defendant Anthony E. Almeida[,] III's Motion To Suppress and to Defendant John Martin's Motion To Suppress ("Government Response") (Docket No. 57) at 13. I expect the government to honor this pledge.

An evidentiary hearing was held before me on December 8, 2011, at which both defendants appeared with counsel. The government tendered four witnesses and offered 22 exhibits, 18 of which were admitted without objection and four of which were admitted over objection. Defendant Martin recalled one of the government's witnesses and offered eight exhibits, five of which were admitted without objection, one of which was admitted over objection, and two of which were excluded after the government's objection to their admission was sustained. After both sides rested, counsel for each of the defendants and for the government argued orally. I now recommend that the following findings of fact be adopted and that both motions be denied.

## I. Proposed Findings of Fact

ACSO Detective Maurice Drouin was patrolling Route 4 in Turner, Maine, in his cruiser on July 5, 2011, when, at 3:15 a.m., he observed a vehicle traveling in the opposite direction with a headlight out. That vehicle was followed by a Chevrolet Silverado pickup truck ("Silverado"), which was the only other vehicle on that stretch of road at that hour. Drouin reversed direction and began to pursue the vehicle that had initially caught his attention, activating his emergency lights. The driver of the Silverado did not yield to his emergency lights for approximately a quarter mile, at which point the Silverado abruptly turned off to the right. Drouin drove past the Silverado in continued pursuit of the other vehicle. However, after observing that vehicle and satisfying himself that it was being operated safely, he decided to focus his attention on the Silverado, deeming it unusual that the driver had avoided yielding to his lights for that period of time, at that hour, on that nearly deserted road. He turned around, soon located the Silverado, and pulled it over.

Drouin observed that the Silverado had a Quebec license plate. He ran a search on his mobile data terminal, which disclosed that the Silverado was registered to a Maynard Martin. He approached the operator and requested his license, registration, and proof of insurance. The operator produced a temporary Maine license containing no photograph, issued to John Martin. Drouin asked the passenger his name, and the passenger responded that he was Joshua Almeida. Drouin engaged in a brief conversation with the operator, who said that he was tired and that he and his passenger were *en route* from New Hampshire to Jay, Maine, to visit a friend. Drouin returned to his cruiser and ran a search on his mobile data terminal that revealed that Martin's driver's license had expired and that Joshua Almeida's license was suspended. He informed the operator and the passenger of the results of his search, issued a warning for driving with an expired license, advised them to pull over if they were tired, and let them go.

As the Silverado headed north toward Livermore Falls, Drouin ran a cross-agency check on John Martin and Joshua Almeida, retrieving photographs of each. He determined that the passenger, rather than the driver, was John Martin, and that the driver appeared to have been Joshua Almeida. He also learned that Joshua Almeida had a reported history of drug possession and trafficking. He once again pursued the Silverado, this time intending to arrest the operator and passenger on charges of driving identity offenses, and radioed his dispatcher to obtain backup from the Livermore Falls Police Department. He caught up with the Silverado just as it was about to cross the bridge from Turner to Livermore Falls and again pulled it over. This time, the real John Martin was driving. Drouin ordered him out of the Silverado, asked him why he had lied, handcuffed him, and patted him down, finding nothing. He then walked Martin to the front seat of his cruiser, had him get in, and placed a seatbelt on him.

Drouin approached the passenger side of the Silverado and ordered the person whom he believed to be Joshua Almeida out of the pickup truck. Unbeknownst to Drouin, "Joshua" Almeida was in fact Anthony E. Almeida, III, Joshua's brother. Drouin handcuffed Almeida and patted him down, retrieving a wallet from his back pocket. He looked inside the wallet and saw a large amount of money wrapped in one or two rubber bands, a presentation that he knew from experience was consistent with drug trafficking.[3] He then put the wallet back in Almeida's pocket.[4] Drouin remembers that, after Almeida got out of the pickup truck, the passenger's side door remained open. Neither he nor Almeida closed it. He does not remember whether the driver's side door was open.

The arrests of Almeida and Martin occurred at about 4 a.m. Drouin attempted to arrange for Martin and Almeida to be bailed in Livermore Falls, so that they could continue on their way. However, he learned that the bail commissioner was unavailable. This meant that Martin and Almeida would have to be transported to the Androscoggin County Jail ("Jail") in Auburn, Maine, approximately 30 to 40 miles away. At about that time, Drouin's partner Travis Lovering arrived at the scene, and he and Drouin placed a call for a K-9 dog to sniff the exterior of the pickup truck. Drouin predicated that request on Joshua Almeida's reported drug trafficking history and the appearance of the money that he had seen in Almeida's wallet. However, Drouin had observed no evidence that either Almeida or Martin had been drinking and, as of that time, no evidence of the presence of drugs. He had no specific basis to believe that there were drugs in the pickup truck until after the K-9 got involved in the case.

---

[3] Only one rubber band is visible in Gov't Exh. 1, which depicts the contents of Almeida's wallet. On cross-examination, Drouin testified that he thought there were two rubber bands, but he was not sure.
[4] On cross-examination, Drouin testified that he did not then seize the wallet because he felt he had only a suspicion of drug trafficking.

Corporal Nathan Bean, a patrol supervisor and K-9 handler for the Franklin County Sheriff's Department, responded to the scene of the traffic stop at about 4:30 a.m. with his K-9, a German shepherd named Diesel. Bean has been a K-9 handler since 2001 and has served as a K-9 school instructor, certifying K-9s. He worked with a K-9 named Ben from 2001 to 2008, and has worked with Diesel since 2008, averaging 100 to 120 calls annually for patrol or narcotic detection work. Diesel is certified in both patrol work and narcotic detection work by the Maine Criminal Justice Academy and the New England State Police. *See, e.g.*, Gov't Exh. 7. As of 2011, K-9s must be recertified once per year; prior to 2011, they had to be recertified twice per year. Bean is required to conduct 16 hours of in-service training per month to maintain Diesel's certifications in both patrol and narcotic detection work. Bean and Diesel are certified as a team. Diesel works only with Bean, with whom he also lives. In Bean's opinion, Diesel has a very high work ability, is a very good police dog, and is a very reliable drug sniffing dog.

Diesel is trained to "indicate," or "alert to," the presence of narcotics by sitting when he detects a narcotics odor and facing the direction of the odor. If he tries to sit and is unable to fully sit, for example, if he is in the interior of a vehicle and there is inadequate space, he usually looks at Bean and begins to bark. Diesel has never given Bean a false positive, that is, an indication of the presence of narcotics in the absence of either drugs or at least a residue odor of drugs.

When Bean arrived at the scene of the traffic stop, Drouin informed him that he wanted him to walk his dog around the Silverado to see if there might be drugs in the vehicle. Bean noticed that both the driver's and passenger's side doors of the Silverado were open and that the vehicle was running. Bean's typical practice, in beginning a K-9 sniff of a vehicle, is to tell Diesel that it is time to "go to work" and to "find some dope," take him to the front of the

vehicle, do an initial walk-around to let him get acclimated to the vehicle, and then walk him around the vehicle three times, starting at the driver's side headlight. That did not happen in this case, however, because as Bean was walking up to the front of the pickup truck with Diesel, who was on a leash, Diesel leapt into the pickup truck through the open driver's side door. Bean did not direct or encourage Diesel to jump into the Silverado. Diesel immediately alerted to the pickup truck's center console. He also subsequently alerted to the passenger's side door panel and to some trash on the back seat floorboard. Diesel was outside of the Silverado when he alerted to the passenger's side door panel of the still open passenger's side door, after Bean took him around to the passenger side of the vehicle. Bean found a small bag of marijuana in the passenger's side door panel.

Bean advised Drouin, who had been inside his cruiser and had not carefully observed the dog sniff, that Diesel had alerted to several spots in the vehicle and that he had retrieved a small bag of marijuana from the passenger's side door, which Bean showed to Drouin.[5] Drouin does not know whether the substance in the bag ever was tested. However, Drouin has been trained to identify marijuana by both sight and odor.

On the basis of the K-9 alerts and the discovery of marijuana, Drouin decided to conduct a full search of the pickup truck and did so with assistance from Lovering and Bean. During that search, Drouin found a spoon with a burnt bottom and drug residue on it, consistent with cooking drugs, and a silver tray with drug residue on it and a small straw, consistent with drug usage. The silver tray was found in the center console of the pickup truck. The spoon later tested

_____

[5] During cross-examination, Martin's counsel pointed out to Drouin that he had stated, in an affidavit dated July 7, 2011, submitted in support of a warrant to search the Silverado, that Bean walked his K-9 around the perimeter of the pickup truck, causing the dog to alert to the presence of drugs. *See* Gov't Exh. 5 at D003-0007. However, at hearing, Drouin maintained that he remembered only that Bean took Diesel out of his cruiser, he spoke with Bean, and Bean went to do the dog sniff while Drouin returned to his cruiser. Thus, there is no testimony contradicting that of Bean regarding the manner in which the initial walk-around was performed.

positive for the presence of cocaine. Bean found a large amount of money wrapped in rubber bands inside a Doritos bag on the floor of the back seat of the pickup truck. Bean also noticed that the screws appeared to have been recently removed from the center console, an indication from his training and experience that something might have been hidden behind it.

At the conclusion of the hand search, Drouin returned to his cruiser and asked Martin and Almeida whether they had any weapons, drugs, or large amounts of money in the pickup truck. They said that they did not. Drouin then stated that officers had found a large amount of money in a Doritos bag. Martin stated that it was his money. Drouin did not administer *Miranda* warnings prior to this questioning.[6] Drouin intended, for record-keeping purposes, to record whose money had been found. At that point, he was unaware that any of the money was counterfeit. Following this brief questioning, another officer took Almeida to the Livermore Falls Police Department to use the bathroom.

At Bean's suggestion, Drouin laid some items found in the pickup truck, including the money from the Doritos bag, on the ground for a dog sniff search. Diesel alerted to the money. Drouin interpreted this as indicating that there was drug residue on the money. Drouin also observed that the money with respect to which Diesel had alerted was bundled in the same manner as the money that he had seen in Almeida's wallet. When Almeida returned and was being escorted back to Drouin's cruiser, Drouin seized Almeida's wallet from his pocket, removed the money from it, and returned it to Almeida. Drouin was unable to estimate the time

---

[6] Pursuant to *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

at which he seized the wallet. Almeida was placed back in the cruiser. The seized money was counted, placed in a bag, and retained as evidence.[7]

Drouin transported Martin and Almeida to the Jail, while Lovering waited at the scene for a tow truck to arrive to remove the Silverado. Pursuant to the Jail's policies, the staff member admitting incoming inmates must conduct a preliminary (pat) search of each new inmate and search the inmate with a hand-held metal detector to make an immediate determination that no weapons or gross contraband are introduced into the holding area. *See* Gov't Exh. 3b at D008-0002. Contraband found during a search is to be turned over to a shift supervisor. *See* Gov't Exh. 3a at D007-0002. When the contraband is discovered on an incoming inmate, the shift supervisor may choose to turn it over to the originating arresting agency for further action. *See id*. In Drouin's experience transporting arrestees to the Jail, contraband found during the intake process typically is turned over to him. Jail officials did find contraband on Martin and turned it over to Drouin. Bail was set at $200 each for Almeida and Martin. Drouin learned from a probation officer at some point on July 5, after Almeida and Martin were jailed, that Almeida was Anthony and not Joshua Almeida.

After Martin and Almeida were processed, Drouin returned to the ACSO to place the items seized during the traffic stop into evidence. As he was counting the seized money, he discovered that one of the bills was smaller than the others. After making some inquiries and determining that real bills would not vary in size, and noticing that some of the seized money had the same serial number, Drouin concluded that some of it was counterfeit and contacted the United States Secret Service ("Secret Service"). He also informed the bail commissioner at the

---

[7] On cross-examination, Drouin agreed that he could have applied for a warrant to seize the wallet, but stated that he did not think of doing so because he felt that he had probable cause to seize its contents as proceeds of drug trafficking.

Jail that he had probable cause to believe that Almeida and Martin had committed aggravated forgery, whereupon the bail commissioner raised their bail to $10,000 each. Even in the absence of Martin's statement admitting that the money in the Doritos bag was his, Drouin would have brought those charges because the money was found in Martin's vehicle.

Later that same day, July 5, 2011, Drouin met with Secret Service Special Agent Matt Fasulo, who concluded on examining the money that some was genuine and some was counterfeit. Drouin informed Fasulo of the statements made by Martin at the scene of the traffic stop. Drouin and Fasulo went to the Jail to speak with Almeida and Martin. Almeida refused to speak with them, but Martin agreed. Martin, dressed in jail clothes, met with Drouin, Fasulo, and a third officer, Lewiston Police Department Detective Matt Verone, in the Jail's family contact room, which is larger than an average interview room. Martin stated that he agreed to talk with them, and Fasulo read him his *Miranda* rights. *See* Gov't Exh. 4. At approximately 6:20 p.m., Martin signed a Warning and Consent To Speak form indicating, *inter alia*, that his rights had been read to him, that he understood them, that he voluntarily and intentionally waived his right to remain silent and to have an attorney at that time, and that he was willing to make a statement and answer questions. *See id*. Drouin signed as a witness to Martin's signature. *See id*.

Fasulo and Drouin jointly conducted the interview. Martin, who seemed fairly agitated to Fasulo, stated that he had gotten the money from his father, who had wired $5,000 to him, that it was real, and that, if it was fake, Almeida must have switched it. He stated again that the money in the Doritos bag was his. Fasulo and Drouin told Martin that they did not believe Martin's story about the money's origin. He told them that he did not wish to talk to them anymore, got up, and left the room.

On July 7, 2011, Drouin obtained a warrant to search the impounded Silverado for drugs or additional counterfeit or real U.S. currency and other evidence related to drug trafficking or counterfeiting. *See* Gov't Exh. 5 at D003-0002-04, D003-0010. Upon searching the Silverado pursuant to the warrant, Drouin found no drugs. Drouin agrees that an inventory search, the aim of which is to document the existence of items, is different from a search to uncover evidence to support criminal charges.

The Silverado, which remained at the ACSO as of the time of the hearing, is the subject of asset forfeiture proceedings initiated by the Secret Service on the basis of the vehicle's use in the transport of counterfeit money. As part of asset forfeiture proceedings, the Secret Service must examine a vehicle, take photographs of its exterior, and conduct an inventory search. Per the Secret Service's policy when a vehicle is seized for forfeiture, such vehicles must be thoroughly searched for personal property. *See* Gov't Exh. 8. Items "having a monetary value" must be removed and inventoried on a form called an SSF 3051. *See id.* If evidence or contraband is found, it must be immediately seized and inventoried on an SSF 1544. *See id.* There is no specific guide to what constitutes an item of value. In Fasulo's opinion, such items would include diamond rings and Rolex watches but not roadmaps. An SSF 1626 Inventory Record of Seized Conveyance also must be prepared. *See id.*

At Fasulo's direction, Secret Service Special Agents Kelley Erskine and Joshua Catella performed an inventory search of the Silverado on July 14, 2011. Catella was from the Boston field office, and Erskine had relocated to the Portland, Maine, office in May 2011 after serving for five and a half years on the counterassault team assigned to the president's detail in Washington, D.C. Erskine had never previously conducted an inventory search. He understood, from speaking with Fasulo, that the purpose of the search was to inventory the vehicle prior to its

asset forfeiture seizure by verifying the vehicle's condition and any items in or around the vehicle. Neither Fasulo nor Erskine expected the inventory search to retrieve any evidence because the pickup truck already had been searched at the scene of the traffic stop, and by Drouin pursuant to a search warrant.

As part of the July 14, 2011, search of the Silverado, Erskine took photographs of its exterior and interior, *see* Gov't Exhs. 9a-9g, and he and Catella filled in an SSF 1626 form detailing the vehicle's condition, *see* Gov't Exh. 10. Erskine did not fill out an SSF 3051 form recording items of value found in the Silverado. He concedes that this was a mistake because he located one item of personal property that he considered to be of value, a small, red cordless drill. He and Catella located several items that they logged on an SSF 1544 form and entered into evidence, including a Canon printer cartridge, a cell phone, a cell phone charger, two empty cardboard tubes, two pieces of paper with markings, a business card, two partial Wal-Mart receipts, and an invoice for medical services. *See* Df't Exh. 10 at R029-0005-06. Erskine did not document, either photographically or in writing, the contents of the pickup truck bed as of the day of his search. At the time that Fasulo directed Erskine to conduct the inventory search of the Silverado, he thought that Erskine knew how to perform such a search. It is now apparent to Fasulo that Erskine had not been fully trained in how to do such a search. Fasulo would have recorded different items of value had he been doing the search.

## II. Discussion

### A. Threshold Standing Issue

As a threshold matter, the government argues that Almeida fails to establish that he had a subjective expectation of privacy in the Silverado or that any such expectation was objectively

reasonable, and, hence, he cannot challenge the search of that vehicle. *See, e.g.*, Government

Response at 9 n.5. As the First Circuit has observed:

> Before a court may reach the merits of a motion to suppress, the defendant carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or . . . the items seized. Although the threshold requirement is referred to as standing, it is more properly considered under a Fourth Amendment analysis. Failure to present evidence with respect to such an expectation prevents a defendant from making a claim for suppression under the Fourth Amendment.

*United States v. Rodríguez-Lozada*, 558 F.3d 29, 37 (1st Cir. 2009) (citations and internal

punctuation omitted). "The Supreme Court has set out a two-part test for analyzing the

expectation question: first, whether the movant has exhibited an actual, subjective, expectation of

privacy; and second, whether such subjective expectation is one that society is prepared to

recognize as objectively reasonable." *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009)

(citation omitted).

At hearing, Almeida's counsel argued that his client had a reasonable expectation of

privacy in the Silverado because, when Drouin first stopped the vehicle, Almeida was driving it

and, as a result, was in exclusive control of it. However, "First Circuit precedent reflects that, in

general, 'standing' does not exist to challenge a search of a vehicle when the defendant neither

owns nor is in possession of the vehicle in question." *United States v. Paquette*, No. CRIM 04-

10BW, 2005 WL 850847, at *2 (D. Me. Apr. 12, 2005) (rec. dec., *aff'd* May 2, 2005) (footnote

and citation omitted). As counsel for the government suggested at hearing, the mere fact that

Almeida was driving the vehicle during the initial traffic stop is insufficient to confer "standing"

to challenge its search, particularly in circumstances in which Martin was found driving it a short

time later. *See, e.g., id.* at *2-*3 (defendant lacked standing to challenge search of vehicle's

trunk when he was neither the owner nor the individual in exclusive possession of the vehicle;

conceivably, he might have been able to establish both "historical use" of the vehicle and that he was able to "regulate access" to it given that vehicle had served as his conveyance for a period of weeks, but on record before court, he lacked "standing" to challenge the constitutionality of search of vehicle) (internal quotation marks omitted).

Almeida therefore cannot challenge either the search of the Silverado during the traffic stop or its subsequent inventory search. In any event, even had he demonstrated that he possessed a reasonable expectation of privacy in the Silverado, I would recommend denial of his motion to suppress the fruits of those searches for the reasons set forth below.

### B. Search of Pickup truck at Scene of Stop

Martin first seeks to suppress evidence seized during the warrantless search of the Silverado in the course of the traffic stop on July 5, 2011, specifically, the genuine and counterfeit currency found in the Doritos bag, on the basis that the search cannot be justified either as incident to his arrest or on the basis of any reasonable safety concern. *See* Martin Motion at 7-9.

The government bears the burden of demonstrating the validity of a warrantless search or seizure. *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality.").

The government disclaims reliance on the doctrine of search incident to arrest or on safety concerns. *See* Government Response at 10. Instead, it invokes the so-called "automobile

exception," *see id.* at 7-9 & n.4, and argues, in the alternative, that the contents of the Doritos bag inevitably would have been discovered, rendering their suppression unwarranted.[8]

### 1. Automobile Exception/Absent Dog Sniff

Pursuant to the automobile exception, officers "who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it" are permitted to "conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant[.]" *United States v. Ross,* 456 U.S. 798, 800 (1982). This exception is grounded in the fact that, "historically[,] warrantless searches of vessels, wagons, and carriages – as opposed to fixed premises such as a home or other building – had been considered reasonable by Congress." *Id.* at 805. "[I]ndividuals always had been on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate's prior evaluation of those facts." *Id.* at 806 n. 8. "Given the nature of an automobile in transit . . . an immediate intrusion is necessary . . . [, and] a warrantless search of an automobile is not unreasonable." *Id.* at 806-07 (footnote omitted). For purposes of the application of the automobile exception, "[t]he mobility requirement is satisfied whenever the vehicle to be searched is operational." *United States v. Garcia*, 433 Fed. Appx. 741, 744 (11th Cir. 2011). "A functioning vehicle is considered to be 'mobile' even if it already has been secured by the police." *Id.*

Because the automobile exception is premised on probable cause, officers must have knowledge of objective facts sufficient to justify the issuance of a warrant to search the vehicle. *See Ross*, 456 U.S. at 807-09. "The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v.*

---

[8] Counsel for the government raised the latter argument at the conclusion of the hearing, based on the evidence adduced at that time. Martin's counsel had an opportunity to respond.

*Acevedo*, 500 U.S. 565, 580 (1991). "Probable cause exists where the facts and circumstances within [the knowledge of officers] of which they had reasonably trustworthy information [are] sufficient . . . to warrant a man of reasonable caution in the belief that an offense has been committed or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175-76 (1949) (citation and internal quotation marks omitted). "Probable cause" means "more than bare suspicion[.]" *Id.* at 175.

The government cites *United States v. Mayo*, 627 F.3d 709, 713 (8th Cir. 2010), and *United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994), for the proposition that Drouin had probable cause to search the Silverado based on (i) his observation of the pickup truck's erratic driving at 3:15 a.m., (ii) the provision by Almeida and Martin of false identities, (iii) the discovery in Almeida's wallet of cash bundled in rubber bands, consistent with drug trafficking activities, and (iv) the discovery that "Joshua" Almeida had a history of drug trafficking and possession. *See* Government Response at 8-9. Nonetheless, as Martin's counsel persuasively argued at hearing, *Mayo* and *Harvey* are materially distinguishable in that, in those cases, suspected drugs were discovered prior to the search of a vehicle. *Compare Mayo*, 627 F.3d at 714 ("[W]e think a reasonable person could believe there would be a fair probability of finding drugs in the minivan based on the defendants' nervous behavior, their inconsistent stories, Braiske's drug history, *the discovery of the drug bindles*, and the 'lived-in' look of the minivan.") (emphasis added); *Harvey*, 16 F.3d at 112 ("We hold that *the cocaine found on the person of the driver,* the false information given to the officers regarding the car's ownership, and the fact that none of the individuals in the car had a valid driver's license, provided probable cause for the officers to believe that the car contained other drugs or paraphernalia[.]") (emphasis added).

As Drouin himself testified at hearing, he had no specific basis to believe that there were drugs in the Silverado until after the K-9 got involved in the case. The few indicia available to him prior thereto – the erratic driving, the reported drug history of Joshua Almeida, the provision of false identities, and the presence in Almeida's wallet of money bundled in rubber bands – conveyed no more than a reasonable suspicion, not probable cause, to believe that the Silverado contained evidence of drug trafficking. The government's reliance on the existence of probable cause prior to the K-9 search, hence, is misplaced.

### 2. Automobile Exception/With Dog Sniff

The government alternatively argues that (i) Diesel's immediate search of the interior of the Silverado did not constitute a Fourth Amendment violation, and (ii) the dog's alert on the pickup truck's center console conferred probable cause for the search that followed. *See* Government Response at 9 n.4.

The First Circuit has held that "the canine sniff of the exterior of a vehicle which is legitimately within the custody of the police is not a search within the meaning of the fourth amendment; and . . . subjecting the exterior of such a motor vehicle to the olfactory genius of a drug detection dog does not infringe upon the vehicle owner's fourth amendment rights." *United States v. Rodriguez-Morales*, 929 F.2d 780, 788 (1st Cir. 1991) (footnote omitted). In turn, "a reliable canine sniff outside a vehicle can provide probable cause to search the vehicle." *United States v. Brown*, 500 F.3d 48, 57 (1st Cir. 2007) (footnote omitted).

In this case, however, as Bean was preparing to walk Diesel around the exterior of the Silverado to perform his customary dog sniff test, Diesel leapt into the vehicle through the open driver's side door, alerting on the center console. As the government implicitly acknowledges, *see* Government Response at 9 n.4, the First Circuit has not considered whether there are

circumstances in which a search of the *interior* of a vehicle by a dog infringes a vehicle owner's Fourth Amendment rights. However, at least three United States circuit courts of appeals have addressed the issue, concluding that such an intrusion does not implicate the Fourth Amendment in cases in which "(1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or a window, used by the dog." *United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009). *Accord United States v. Pierce*, 622 F.3d 209, 212-15 (3d Cir. 2010); *United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007).

At hearing, Martin's counsel challenged the "convoluted logic" of the *Pierce* opinion, reasoning that, pursuant to *Pierce*, no warrant ever would be needed to search the interior of a vehicle in the absence of probable cause, whether by human search, drone, pole camera, or K-9. In any event, he argued, Bean did encourage Diesel to leap into the Silverado when he commanded him to "go to work" and "find some dope" as he was leading him on a leash to the front of the vehicle.

Nonetheless, as the government's counsel rejoined at hearing, the rationale of *Pierce* and similar cases is not so broad as to generally sanction searches of the interior of vehicles without probable cause. Rather, *Pierce*, *Vazquez*, and *Lyons* all turn on whether a particular entry of a vehicle was the product of instinctive animal behavior. *See, e.g., Pierce*, 622 F.3d at 214 ("Perforce, 'instinctive' implies the dog enters the car without assistance, facilitation, or other intentional action by its handler."); *Vazquez*, 555 F.3d at 930 ("the dog's leap into the car was instinctual rather than orchestrated"); *Lyons*, 486 F.3d at 373 ("Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment."). These cases cannot fairly be read to approve of a search of the interior of a vehicle, absent probable cause, by

human hand, pole camera, or drone, any of which would be the product of human design rather than animal instinct. I perceive no reason why the First Circuit, which has recognized that "subjecting the exterior of . . . a motor vehicle to the olfactory genius of a drug detection dog does not infringe upon the vehicle owner's fourth amendment rights[,]" *Rodriguez-Morales*, 929 F.2d at 788 (footnote omitted), would not follow the *Pierce* line of cases.

Applying the rationale of *Pierce*, I readily conclude that Diesel's leap into the Silverado did not implicate Fourth Amendment concerns. From all that appears, the doors to the Silverado were left open after Drouin effectuated the arrests of Martin and Almeida, prior to the decision to call for a K-9 team. They remained open when Bean arrived on the scene approximately one half hour later. There is no evidence that Drouin, Bean, or any other law enforcement officer deliberately left the doors open to facilitate Diesel's entry into the vehicle. Nor did Bean command or encourage Diesel to leap through the open door. Bean's customary command to Diesel, at the start of the drug sniff, to "go to work" and "find some dope," was not in itself a facilitation of Diesel's leap into the vehicle. Indeed, a similar general and customary command had been given to the K-9s in *Pierce* and *Lyons*. *See Pierce*, 622 F.3d at 211; *Lyons*, 486 F.3d at 370.

Martin makes one final argument against the use of the K-9 sniff to establish probable cause for the roadside vehicle search. At hearing, his counsel contended that, while the government established that Bean and Diesel were certified, it provided no detail whatsoever concerning the standards by which a dog's reliability is measured, making it impossible to gauge whether the dog sniff met standards of scientific reliability pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Counsel pointed out that, although Drouin testified that a spoon found in the Silverado tested positive for the presence of cocaine, there is no evidence that

any other item seized from the pickup truck was tested for the presence of drugs or drug residue or that the purported marijuana was confirmed to be marijuana.

Martin offers no authority for the proposition that the government must present *Daubert*-type evidence to establish the scientific reliability of K-9 drug sniffing training. My research indicates that courts generally have rejected the proposition that a *Daubert*-type scrutiny is appropriate in these circumstances and/or have held that evidence of a drug detection dog's training and certification establishes its reliability. *See, e.g., United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011) (declining to "mount a full-scale statistical inquisition into each dog's history" and relying, instead, on dog's certification; observing, "After all, it is safe to assume that canine professionals are better equipped than judges to say whether an individual dog is up to snuff."); *United States v. Berrelleza*, 90 Fed. Appx. 361, 365 (10th Cir. 2004) ("Those courts which have considered the issue have properly noted that a *Daubert* hearing is the wrong procedural tool to challenge the reliability of a drug detection dog."); *United States v. Wilson*, ___ F.R.D. ___, Criminal No. WDQ-10-0488, 2011 WL 5842583, at *6-*7 (D. Md. Nov. 18, 2011) (denying motion to exclude dog sniff evidence under *Daubert* or on the basis of K-9's asserted false positives; stating, "A drug dog alerts in the presence of an odor – even if the controlled substance is no longer present at the site of the alert. An alert establishes probable cause if there are some indicia of reliability for the alert. Evidence of a dog's training and certification is enough by itself to establish the dog's reliability so that his positive alerts for controlled substances establish probable cause.") (citations and internal punctuation omitted).

Although the First Circuit has not addressed the question of the applicability of *Daubert* in this context, it, too, has indicated that evidence of a K-9's training and certification generally suffices to establish its reliability as a drug sniffing dog. *See, e.g., United States v. Lopez*, 380

F.3d 538, 544 n.4 (1st Cir. 2004) (upholding district court's finding that drug sniffing dog was reliable based on testimony of handler that dog was certified, had never given a false indication, and was consistently focused on certain area in defendant's van); *United States v. Owens*, 167 F.3d 739, 749-50 (1st Cir. 1999) (upholding district court's finding that drug sniffing dog was reliable despite failing to pass certification tests, in circumstances where witnesses offered explanations for failures and training supervisor and handler testified that dog was extremely reliable); *United States v. Meyer*, 536 F.2d 963, 966 (1st Cir. 1976) (holding that, for purposes of the issuance of a search warrant, magistrate could reasonably infer that dog who had been trained and used in drug investigations "had attained a high degree of proficiency in detecting the scent of narcotics"; observing, "a canine, when trained, reacts mechanically to certain cues in his environment").

In this case, Bean testified without contradiction that he has worked with Diesel since 2008, that Diesel is certified by both the Maine Criminal Justice Academy and the New England State Police to perform narcotics detection work, that Diesel has never given Bean a false positive, and that he is a very good, reliable drug sniffing dog. This suffices to establish Diesel's reliability, even in the absence of testing confirming that every item to which he alerted contained at least a residue odor of drugs. In any event, there is evidence that Diesel properly alerted to the bag of suspected marijuana.[9] Although there is no evidence that the suspected marijuana was tested, Drouin, who was trained to recognize marijuana by sight and odor, was capable of verifying that the substance to which Diesel alerted in the passenger's side door of the pickup truck was indeed marijuana.

---

[9] While Drouin also seized a spoon that later testified positive for the presence of cocaine, it is not clear whether he seized it from a location to which Diesel alerted.

For all of the foregoing reasons, Diesel's indication of the presence of drugs in the Silverado conferred probable cause to search the vehicle.

### 3. Inevitable Discovery

Assuming *arguendo* that the government cannot rely on Diesel's alert, upon leaping into the Silverado, to the presence of drugs in the vehicle's center console, I agree with the government that the currency in the Doritos bag inevitably would have been discovered through an exterior drug sniffing search.

The "inevitable discovery" exception to the exclusionary rule "recognizes that, if the evidence would have been discovered lawfully, the deterrence rationale has so little basis that the evidence should be received[,]" *United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006) (citation and internal quotation marks omitted).

The government bears the burden of proving, by a preponderance of the evidence, that the inevitable discovery exception applies. *See, e.g., United States v. Scott*, 270 F.3d 30, 42 (1st Cir. 2001). "The prosecution may not rely on speculation but rather must meet this burden of proof based on demonstrated historical facts capable of ready verification or impeachment." *United States v. Ford*, 22 F.3d 374, 377 (1st Cir. 1994) (citation and internal quotation marks omitted). In analyzing whether the prosecution has met this burden, a court asks "three questions: first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections." *Almeida*, 434 F.3d at 28.

I am satisfied, based on Bean's testimony, that Diesel alerted to the bag of marijuana in the passenger's side door of the Silverado at a point when he was outside of the vehicle and that, had Diesel not leapt into the vehicle, he would have alerted to the bag of marijuana from the exterior of the vehicle, as indeed he did. The alert to the bag of marijuana, in turn, would have conferred probable cause to search the Silverado. That search, in turn, inevitably would have led to the discovery of the currency in the Doritos bag, to which Diesel alerted when inside the vehicle. That discovery would have been both independent of Diesel's alert on the center console of the vehicle after leaping in through the driver's side door, and inevitable. In the absence of any evidence of the use of a deliberate stratagem to encourage Diesel to leap inside the vehicle, the application of the inevitable discovery rule would not weaken Fourth Amendment protections or encourage police misconduct. *See Wilson*, 2011 WL 5842583, at *2, *6 (drugs were alternatively admissible under inevitable discovery doctrine when K-9 had not only sniffed the inside of a vehicle with an open passenger door but also had stood on his hind legs near the driver's side door, providing probable cause for an interior search).

For this independent, alternative reason, suppression of the currency found inside of the Doritos bag is inappropriate.

### C. Seizure of Almeida's Wallet

Almeida challenges the search of his wallet following his arrest, citing *United States v. Maddox*, 614 F.3d 1046 (9th Cir. 2010), for the proposition that, because his wallet was a closed container no longer within his control, no exigency justified its search without a warrant. *See* Almeida Motion at 4-5.

The government relies on the so-called "plain view" exception to justify Drouin's seizure of the wallet and its contents, distinguishing *Maddox* on the basis that the contents of the closed

container in *Maddox*, unlike the contents of Almeida's wallet, never had been in plain view. *See* Government Response at 13 n.7; *Maddox*, 614 F.3d at 1047 (after seizing key chain, officer removed the top of a metal vial attached to it, discovering substance believed to be methamphetamine).[10] Alternatively, the government invokes the inevitable discovery exception, contending that the wallet and its contents would have been seized when Almeida was taken to the Jail. *See* Government Response at 13.

### 1. Plain View

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (citation and internal quotation marks omitted). "[P]olice officers may seize an object in 'plain view' without a warrant if they have probable cause to believe it is contraband without conducting some further search of the object, i.e., if its incriminating character is immediately apparent." *United States v. Schiavo*, 29 F.3d 6, 9 (1st Cir. 1994) (citation and internal quotation marks omitted).

As the First Circuit has explained, the plain view doctrine allows a seizure where "(1) the seizing police officer lawfully reached the position from which he could see the item in plain view; (2) the seizure satisfied the probable cause standard; and (3) the seizing officer had a lawful right of access to the object itself." *United States v. Antrim,* 389 F.3d 276, 283 (1st Cir. 2004) (internal quotation omitted). The government bears the burden of proving entitlement to the plain view exception to the warrant requirement. *See, e.g., United States v. Ribeiro*, 397 F.3d 43, 53 & n.8 (1st Cir. 2005).

---

[10] *Maddox* is also distinguishable in that, there, the government argued that the search of the key chain was proper as incident to a lawful arrest. *See Maddox*, 614 F.3d at 1048. The government makes no such argument with respect to the seizure and search of Almeida's wallet.

The government persuasively argues that:

1.      Drouin lawfully viewed the wallet and its contents as part of the initial pat-down search.  *See, e.g., United States v. Vongkaysone*, 434 F.3d 68, 75 (1st Cir. 2006) ("If an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest.") (citation and internal quotation marks omitted).[11]

2.      As of the time of the seizure of the wallet, if not earlier, Drouin had developed probable cause to seize the currency based on (i) his observation of the pickup truck's erratic driving at 3:15 a.m., (ii) the provision by Almeida and Martin of false identities, (iii) the discovery in Almeida's wallet of cash bundled in rubber bands, consistent with drug trafficking activities, (iv) the discovery that "Joshua" Almeida had a history of drug trafficking and possession, and (v) the discovery of drug paraphernalia and similarly bundled money in the Doritos bag in the car.

3.      Drouin had a lawful right of access to the currency because an officer is entitled to seize contraband as part of a lawful traffic stop.  *See, e.g., United States v. Jones*, 187 F.3d 210, 221 (1st Cir. 1999) ("[T]he plain view exception to the warrant requirement necessitates that the officer have a lawful right of access to the object itself.  The Supreme Court repeatedly has recognized that officers have a right of access to contraband that they discover while acting within the bounds of a lawful *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] investigation.") (citations, internal quotation marks, and footnote omitted).

In this case, there is a wrinkle in the application of the doctrine: Drouin did not seize the currency immediately upon viewing it.  Nonetheless, as the government observes, *see* Government Response at 12, there is precedent for permitting a "plain view" seizure in

---

[11] Almeida does not challenge the lawfulness of his arrest.  *See generally* Almeida Motion.

circumstances in which, although the incriminating nature of an object was not apparent upon its discovery, it became apparent before the completion of a search of a home, *United States v. Johnston*, 784 F.2d 416, 420 (1st Cir. 1986) ("Johnston would . . . have us limit our inquiry to Hyde's belief when he first viewed the items.  Although the police are not allowed to scrutinize the items closely to ascertain their incriminating nature, they are not limited by the chance of which room they happen to search first. . . . A plausible limitation would require Hyde to form probable cause during this search in this house[.]").  *See also Jones*, 187 F.3d at 219-20 & n.8 (rejecting argument that officer violated Fourth Amendment when, after having briefly seen counterfeit money during a *Terry* stop, he asked the defendant to produce the money again and seized it; noting that, with respect to the plain view doctrine, at least one Supreme Court case has criticized "the 'immediately apparent' characterization as 'an unhappy choice of words'") (citation omitted); *United States v. Reynolds*, No. CR-07-86-B-W, 2009 WL 1090674, at *10 (D. Me. Apr. 21, 2009), *aff'd*, 646 F.3d 63 (1st Cir. 2011) (guns were lawfully seized pursuant to plain view doctrine when officer had developed probable cause to believe, by time of seizure, that they were evidence of the crime of unlawful possession).

In this case, as the government suggests, a reasonable outer boundary for purposes of a plain view seizure is the conclusion of the traffic stop, *see* Government Response at 12; *see also, e.g., Jones*, 187 F.3d at 220 n.8, the overall length of which Almeida does not challenge, *see generally* Almeida Motion.  The wallet's contents were seized prior to the conclusion of that stop.

Drouin's seizure of the wallet and search and seizure of its contents meet the plain view exception to the need for a warrant.  Almeida's motion to suppress the currency contained within his wallet, accordingly, should be denied.

## 2. Inevitable Discovery

Even assuming *arguendo* that the plain view doctrine is inapplicable on the facts of this case, the government persuasively argues that the contents of the wallet inevitably would have been discovered and seized by an independent, lawful means when Almeida was processed at the Jail. Jail policies provide for a thorough search of incoming inmates, the removal of items of personal property and contraband, and, at the discretion of the shift supervisor, the provision of contraband to the original arresting agency. Drouin testified that contraband found on incoming inmates whom he has transported to the Jail typically has been turned over to him. Indeed, contraband that was found on the person of Martin was turned over to Drouin on July 5, 2011. Almeida does not suggest, and it is not otherwise apparent, that the application of the inevitable discovery doctrine on these facts would provide an incentive for police misconduct or significantly weaken constitutional protections.

Almeida's motion to suppress the currency found in his wallet, hence, alternatively should be denied on this basis.

## D. Martin's Statements at Jail

Martin next seeks to suppress statements that he made at the Jail on the evening of July 5, 2011, on grounds that the administration of *Miranda* warnings at that time was insufficient to erase the taint of Drouin's failure to administer such warnings prior to eliciting the same incriminating statements at the roadside stop. *See* Martin Motion at 10-11; Reply to Government's Objection to Defendant's Motion To Suppress ("Martin Reply") (Docket No. 74) at 2-3. At hearing, Martin's counsel agreed with the government, *see* Government Response at 14, that the controlling precedent is *United States v. Jackson* ("*Jackson I*"), 544 F.3d 351 (1st

Cir. 2008), which the First Circuit revisited, following a remand, in *United States v. Jackson* ("*Jackson II*"), 608 F.3d 100 (1st Cir. 2010).

In *Jackson I*, the First Circuit stated, in relevant part:

> An earlier simple failure to administer the *Miranda* warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will does not so taint the later investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Thus, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Jackson I*, 544 F.3d at 360 (citations and internal punctuation omitted).

In *Jackson II*, the First Circuit upheld the district court's finding on remand that the defendant's warned statements at a police station were admissible despite the earlier elicitation of incriminating unwarned statements at an apartment. *See Jackson II*, 608 F.3d at 103-04. The court observed that (i) the earlier, unwarned statements had not been coerced, and (ii) the police had not employed the deliberate strategy, denounced in *Missouri v. Seibert*, 542 U.S. 600, 605 (2004), of obtaining a confession without a *Miranda* warning, re-administering the warning, and then re-eliciting the confession using the prior inadmissible confession as a lever. *See id*.

Post-*Jackson*, the First Circuit restated the applicable test as follows:

> [W]here law enforcement officers have not engaged in coercive or improper tactics in obtaining an initial statement, but merely failed to advise a defendant of his *Miranda* rights, determining the admissibility of a subsequent statement is relatively straightforward. Such a statement is admissible if it was obtained after the defendant: (1) was advised of his or her *Miranda* rights; and, (2) knowingly and voluntarily waived those rights.

*United States v. Verdugo*, 617 F.3d 565, 574 (1st Cir. 2010) (citation and internal quotation marks omitted).

In this case, as in *Jackson II*, no coercive or improper tactics were used to elicit Martin's roadside unwarned statement that the money was his. The conversation was brief. Drouin asked

whether there were any weapons, drugs, or large amounts of money in the car, which both Almeida and Martin denied. Drouin then stated that officers had discovered a large amount of money in a Doritos bag, and Martin admitted that it was his. Drouin plausibly testified that he needed to know, for record-keeping purposes, who owned the money. *See United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011) (statement was not the product of coercion in circumstances in which, *inter alia*, "[t]he tone of the interview was cordial, its length was reasonable, and the defendant was not deprived of any essentials" and "no inducements were offered and no threats were voiced") (footnote omitted). Nor do the circumstances suggest that Drouin deliberately elicited an unwarned statement with a view to using it as a lever to extract a later, warned statement in the context of a counterfeit money investigation. Among other things, he was unaware at the time of the initial questioning that any of the money was counterfeit.

In addition, Martin knowingly and voluntarily waived his *Miranda* rights when read them at the Jail. As in *Jackson II*, "a break and a change of scene occurred" between the unwarned and the warned questioning. *Jackson II*, 608 F.3d at 104. The warned questioning did not occur until approximately 6:20 p.m. on July 5, 2011, at the Jail, some hours after the unwarned early morning roadside questioning. Fasulo read Martin his *Miranda* rights, and Martin indicated in a writing that he understood them and agreed to waive them. *See* Gov't Exh. 4.

While Drouin participated in the Jail questioning and had briefed Fasulo concerning the prior unwarned questioning, there is no evidence that the officers used Martin's prior statement as a lever to extract a fresh, warned statement. Although Martin again acknowledged that the money was his, he stated that he had obtained it from his father and had no knowledge that any of it was counterfeit. When Fasulo and Drouin expressed skepticism as to the veracity of that statement, Martin refused to talk further and left the interview room.

In the totality of the circumstances, it is clear that he made a deliberate choice to speak with the officers, refusing to continue speaking with them when he perceived that the conversation no longer was of potential benefit.

Martin's motion to suppress the warned statements that he made at the Jail accordingly should be denied.

### E. Fruits of Secret Service Inventory Search

Martin finally seeks to suppress evidence seized by Secret Service agents Erskine and Catella on July 14, 2011, in particular a Canon printer cartridge, on the basis that the search did not qualify as a proper "inventory search" but, rather, appears to have been "a general rummaging through the pickup in order to discover potentially incriminating evidence." Martin Motion at 9.

"[I]nventory searches are . . . a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id*. at 372. Absent a "showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation[,]" such searches have been upheld. *Id*.

"[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). "The policy or practice governing inventory searches should be designed to produce an inventory." *Id*. "The individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime." *Id*. (citation and internal quotation marks omitted). "But in forbidding uncanalized discretion to police officers

conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion." *Id.*

Martin argues that because, in this case, Erskine and Catella inventoried only items that they considered to be of evidentiary value, making no complete inventory of items in the Silverado or even of items of value therein, it is evident that they were searching for incriminating evidence rather than conducting a legitimate inventory. *See* Martin Motion at 9-10. The government acknowledges that Secret Service inventorying policies were not perfectly followed but contends that the search nonetheless was a legitimate inventory search for asset forfeiture purposes, undertaken in good faith. *See* Government Response at 15.

The government has the better argument. That Erskine and Catella did not follow the inventory policy to the letter is not fatal to the government's reliance on the inventory search exception to the warrant requirement. *See, e.g., Bertine*, 479 U.S. at 369-70, 375-76 (upholding finding that inventory search of vehicle was conducted for legitimate purposes in light of standardized criteria, despite being performed in a "somewhat slipshod" manner) (citation and internal quotation marks omitted); *United States v. Mundy*, 621 F.3d 283, 293 (3d Cir. 2010) (officers' failure to complete a Towing Report describing personal effects left in vehicle did not demonstrate that they conducted an inventory search as a pretext or in bad faith; "Although compliance with procedures tends to ensure the intrusion is limited to carrying out the government's caretaking function, failure to follow through with standard procedures does not necessarily render the search unreasonable.") (citation and internal quotation marks omitted); *United States v. Lopez*, 547 F.3d 364, 371-72 (2d Cir. 2008) ("It would serve no useful purpose to require separate itemization of each object found, regardless of its value, as a precondition to accepting a search as an inventory search. Such an obligation would furthermore interfere

severely with the enforcement of the criminal laws by requiring irrational, unjustified suppression of evidence of crime where officers, conducting a *bona fide* search of an impounded vehicle, found evidence of serious crime but, in making their inventory, failed to distinguish between the maps of Connecticut and New York, or failed to list separately the soiled baby blanket or a pack of gum."); *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998) (observing, "although adherence to procedures shows lack of pretext, deviation from procedures does not prove pretext"; holding that officers' failure to complete inventory list at scene of impoundment when seized items were later listed on an inventory form did not invalidate inventory search); *United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986) ("We will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search.").

Likewise, that Erskine and Catella seized and inventoried items that they believed to be evidence of crimes and/or that they may have been motivated *in part* to search for evidence is not fatal. *See, e.g., Lopez*, 547 F.3d at 372 ("[T]he Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search."); *United States v. Gordon*, 23 F. Supp.2d 79, 84 (D. Me. 1998) ("As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure.") (citation and internal quotation marks omitted).

In this case, the evidence as a whole indicates that the July 14, 2011, search by Erskine and Catella was undertaken to conduct an inventory search incident to the asset forfeiture of the Silverado, not as a pretext to conduct a general rummaging for evidence. Pursuant to Secret Service policies, such an inventory search must be undertaken as part of an asset forfeiture

proceeding. *See* Gov't Exh. 8. Fasulo tasked Erskine to do just that. Both Fasulo and Erskine were aware, prior to the search, that the Silverado had already been searched twice, at the roadside stop and by Drouin pursuant to a warrant. They credibly testified that they did not expect to find any additional evidence.

While Erskine seized and inventoried items that he thought, mistakenly or not, might constitute evidence of the commission of a crime, this was done pursuant to Secret Service inventorying policies, which contemplate the logging and seizure of such items if encountered pursuant to an inventory search. *See id.* (describing SSF 1544 form). Consistent with his mission to complete an inventory search for asset forfeiture purposes, Erskine filled in a second of three potentially pertinent forms, the SSF 1626, inventorying the condition of the Silverado itself. *See id*. (describing SSF 1626 form). Although Erskine failed to complete the third form inventorying items of value found in the pickup truck, *see id*. (describing SSF 3051 form), or to inventory either photographically or on paper the contents of the pickup truck bed, he had never before conducted a vehicle inventory and was not properly and thoroughly trained to do so. He testified that he made a mistake, and that he now appreciates that he should have completed the SSF 3051 form.

In any event, Secret Service inventorying policies do not require the inventorying of every single non-evidentiary item in a vehicle; they mandate only the inventorying of "items having a monetary value[,]" *id*., an undefined term whose application necessarily entails the making of a judgment call by the inventorying agent. Erskine remembered seeing only one item that, in his judgment, qualified as an item of value that should have been inventoried on the SSF 3051 form: a cordless drill. While Fasulo testified that, had he been doing the inventory search, he would have logged additional items of value, that testimony does not undermine the status of

the Erskine/Catella search as a *bona fide* inventory search. Any deviations between the approach that Fasulo might have followed, and the approach that Erskine and Catella did follow, can be attributed either to differing judgment calls as to the meaning of the phrase "items of value" or to a lack of training and experience on Erskine's part.

On these bases, Martin's bid to suppress evidence collected during the July 14, 2011, inventory search of the Silverado should be denied.

### III. Conclusion

For the foregoing reasons, I recommend that Martin's and Almeida's motions to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 9th day of January, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge